## MOORE v. NEW YORK COTTON EXCHANGE et al.

(Circuit Court of Appeals, Second Circuit. December 17, 1923.)

No. 40.

1. **Equity ⬯17—Courts concerned only in protection of property rights.**
   Courts of equity are concerned only in the protection of property rights, and it is that upon which their jurisdiction depends.

2. **Equity ⬯17—Right to acquire property entitled to protection.**
   The right to acquire property is as much entitled to protection as the right to protect in equity the property already acquired.

3. **Trade-marks and trade-names and unfair competition ⬯79—Bill cannot be maintained in court under Federal Trade Commission Act.**
   Since the only relief that the Federal Trade Commission Act (Comp. St. §§ 8836a–8836k) provides is before the Federal Trade Commission, it affords no support whatever for a bill in equity in the courts.

4. **Monopolies ⬯24(2)—Suits maintainable by individual for injunctive relief in federal court from violation of Anti-Trust Act.**
   The Sherman Anti-Trust Act (Comp. St. § 8820 et seq.) invested the District Courts with jurisdiction to protect trade and commerce against unlawful restraints and monopolies, but did not authorize a suit by an individual or corporation for injunctive relief in a federal court, but the Act of October 15, 1914, known as the Clayton Act, in section 16 (Comp. St. § 8835o), gives an individual or a firm the right to sue for and have injunctive relief against threatened loss or damage by violation of the anti-trust laws.

5. **Contracts ⬯117(1)—Monopolies ⬯12(3)—Contract between Cotton Exchange and telegraph company respecting quotations held not in restraint of trade or the creation of a monopoly.**
   A contract between the New York Cotton Exchange and the Western Union Telegraph Company, whereby the telegraph company agreed not to furnish continuous quotations to any person without the consent of the exchange, is not in restraint of trade or commerce and does not create a monopoly or attempt to monopolize any part of interstate commerce in violation of Sherman Act (Comp. St. § 8820 et seq.) and Clayton Act.

6. **Monopolies ⬯12(1)—Contracts which are in restraint of trade.**
   Where the facts clearly show that the purpose of a contract is not to regulate, obstruct, or restrain interstate commerce, but that the object is properly and fairly to regulate the transaction of the business in which the parties to it are engaged, the agreement will be upheld as not within the Sherman Anti-trust Act (Comp. St. § 8820 et seq.) nor the Clayton Act.

7. **Exchanges ⬯13—Monopolies ⬯12(3)—Exchange has property right in quotations which it collects, and it is under no duty to sell the same.**
   The New York Cotton Exchange has a property right in quotations which it collects, and as such owner is under no legal duty to sell its quotations to any particular person, and not to all because it sells to some.

⬯For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

8. **Commerce** ⬡29—Transactions of New York Cotton Exchange not interstate commerce.

The contracts made on the New York Cotton Exchange are made in the board room in the city of New York and provide that the cotton is deliverable from licensed warehouses in the Port of New York, and such transactions are local in character and do not involve interstate commerce.

9. **Courts** ⬡351½—Independent cause of action in equity may be counterclaimed, and is not effected by dismissal of bill on merits.

Under Equity Rule 30 (198 Fed. xxvi), if defendant in equity has an independent cause of action against the plaintiff, he may counterclaim it, and a counterclaim so pleaded, being in effect a "cross-suit," is not effected by a decree dismissing the bill on the merits.

10. **Courts** ⬡263—Federal court has jurisdiction of cross-bill without reference to citizenship of parties.

Original suit and cross-bill are but one cause, and jurisdiction of the former includes the latter, and, if the court has jurisdiction of the original bill, it has jurisdiction of the cross-bill without reference to the citizenship of the parties, and the cross-bill need not disclose grounds of federal jurisdiction, and, original bill having been dismissed on the merits, relief may be given under the cross-bill, though it could not have been sustained as an original bill for lack of jurisdiction.

11. **Equity** ⬡39(1)—Jurisdiction retained to give relief.

A cause once properly in a court of equity for any purpose will be retained to grant relief which otherwise might not be within the range of its authority.

12. **Equity** ⬡133—Particular fact upon which equity rests must be clearly alleged.

When the equity of a bill rests upon the existence of a particular fact, it is necessary that that fact should be clearly alleged.

13. **Injunction** ⬡118(1)—Allegations of bill must ordinarily be specific.

The allegations of a bill seeking an injunction must be specific, allegations made upon information and belief being as a rule insufficient, and, in any case where the matters do not lie within the personal knowledge of plaintiff and he alleges them on information and belief, the statements of the bill as to such matters should be corroborated as far as possible by the affidavits of persons having personal knowledge.

14. **Injunction** ⬡34—Exchange may protect quotations.

An exchange may protect by injunction its right in quotations which it collects.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by Frank Moore, president of the Odd-Lot Cotton Exchange of New York, against the New York Cotton Exchange and others. From an order (291 Fed. 681) denying complainant's motion and granting defendants' motion for a preliminary injunction, the complainant appeals. Affirmed, with directions to dismiss the bill.

This cause comes here on appeal from the United States District Court for the Southern District of New York.

The Odd-Lot Cotton Exchange, for whose benefit and that of its members this action was brought, is an unincorporated association organized and operating under the laws of the state of New York. Its president is authorized by the laws of that state to bring suits in his own name on its and its members' behalf. It has a membership of 100 or more and maintains an Exchange in the city of New York wherein its members buy and sell cotton for future delivery without limit as to quantity, except that no lot bought or sold shall be less than 10 bales, nor more than 100 bales. It is otherwise unlimited as to the quantity dealt in.

⬡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The New York Cotton Exchange is a corporation created by special legislative enactment of the state of New York. It has a membership of more than 400 and maintains an Exchange in the city of New York for the purchase, sale, and exchange of cotton, and to facilitate dealings and transactions in that commodity, and to diffuse information as to prices, quotations, and such other matters as relate to the trade and business of dealing in said commodity. It is unlimited as to the quantity of cotton dealt in, except that no lot shall be less than 100 bales.

The Western Union Telegraph Company is also a New York corporation, and it has its principal office in the city of New York. It is a public service corporation engaged in interstate commerce by transmitting messages by means of telegraph and cable wires between the various states and territories of the United States, and between such states and territories and foreign countries.

The Gold & Stock Telegraph Company is also a New York corporation, and it likewise has its principal office in the city of New York. It also is engaged in interstate commerce and in disseminating market news and the continuous and instant quotations of cotton prices by means of ticker service located in Exchanges and Brokerage Houses and with cotton dealers throughout the United States.

This suit was brought for a violation of the Anti-Trust Laws of the United States.

It is alleged that the Odd-Lot Cotton Exchange opened its Exchange in New York City in August, 1922, and that in order to serve promptly and efficiently its members, brokers, and customers, it is necessary that it have what is known as a continuous ticker service owned and operated by defendants, the Western Union Telegraph Company and the Gold & Stock Telegraph Company, and in order to procure same, complainant made application, as is required by the said two companies for said ticker service, said application being dated on or about July 1, 1922, and being the printed application required by defendants to be signed by all applicants for their continuous quotations as set forth in the contract between the New York Cotton Exchange and the Western Union Telegraph Company. In making its application it alleges that it was then able, willing, and offered to pay whatever charges might be made and exacted therefor and to comply with all requirements of defendants, and is now ready, able, and willing and offers to pay said charges. and to comply with all requirements of defendants. That at the time when it made its application to the manager of the Western Union Telegraph Company, its representative was informed that said application could not be granted, except upon the express consent of the New York Cotton Exchange. That since the making of said application, the said Western Union Telegraph Company and the Gold & Stock Telegraph Company have failed and refused to install a ticker for the use of complainant giving continuous cotton quotations, as called for in the application, and the New York Cotton Exchange has failed and refused to give its consent to the installation of said ticker service for continuous cotton quotations.

The amended bill of complaint is of great length covering more than 20 printed pages. It is not necessary for present purposes to set forth its various allegations. But it is alleged that by reason of various matters which are set forth the "New York Cotton Exchange can and does influence and control all dealing, trading and commerce in cotton in the United States and to a large extent in foreign countries and therefore has thereby monopolized the cotton commerce in the United States, and that the free competitive flow of interstate commerce in such product is hampered, restrained, and monopolized by the said defendants."

It is also alleged that "the New York Cotton Exchange is a monopoly, having complete domination and control of the cotton market for the purchase and sale for future delivery, as hereinbefore alleged; that it has complete control over the receipt and dissemination of the market quotations from foreign markets, and of the establishment and dissemination of the quotations in the city of New York, and of the manner, and to whom, same may be disseminated from the city of New York and to other exchanges in the United States."

It is further alleged that the contract "hereinbefore alleged between the New York Cotton Exchange and the Western Union Telegraph Company and the Gold & Stock Telegraph Company is in restraint of trade and commerce among the several states, and was made and entered into pursuant to a conspiracy on the part of the New York Cotton Exchange and its members, constituting said exchange, in restraint of trade and commerce among the states."

It is further alleged that the "contract between the New York Cotton Exchange and the Western Union Telegraph Company and the Gold & Stock Telegraph Company, and the refusal of the New York Cotton Exhange to allow the Odd-Lot Cotton Exchange of New York to install a cotton ticker, and have the continuous cotton quotations, while allowing same to its competitors as hereinbefore alleged, constitute an unfair method of competition in commerce contrary to the acts of Congress in such cases made and provided."

The amended bill of complaint asked a decree:

(1) Adjudging the New York Cotton Exchange to be a monopoly.

(2) That the contract existing between the defendants be canceled and declared void, concerning the installation of tickers and the giving of continuous cotton quotations.

(3) That the defendants be perpetually restrained from carrying out the said contract, and be restrained from refusing to install in the exchange of the Odd-Lot Cotton Exchange of New York a ticker for the purpose of receiving continuous cotton quotations, and from further refusing to give and disseminate to the Odd-Lot Cotton Exchange of New York, and its members, the continuous cotton quotations, the same as is furnished to and disseminated by the New York Cotton Exchange, through the said two telegraph companies, defendants, to other exchanges, individuals, corporations, and brokers.

(4) That the New York Cotton Exchange, its agents, servants, officers, attorneys, and legal representatives, be further enjoined from in any manner discriminating against the Odd-Lot Cotton Exchange of New York, or any of the members thereof, and that it be enjoined from instructing its members not to deal with the members of the Odd-Lot Cotton Exchange of New York, and from refusing to allow its said members to so deal, and from refusing to allow its members to furnish to the members of the Odd-Lot Cotton Exchange, with whom they deal, the cotton quotations, continuous and otherwise, as may be requested from time to time by the members of the Odd-Lot Cotton Exchange for their use in their transactions with members of the New York Cotton Exchange.

The defendants in their answers admitted that they have refused to install a ticker in complainant's Exchange to supply it with continuous quotations. They also admit that they have entered into a contract by which the Western Union Telegraph Company is allowed to furnish the quotations of the New York Cotton Exchange to any one of whom said Exchange approves, but deny that the purpose or effect of the contract is to restrain trade or commerce or prevent competition. The New York Cotton Exchange also alleges that when it received the application of the complainant for a ticker it made a careful investigation of the character and purposes of appellant and of its members and found that it had been organized to succeed the American Cotton Exchange; that many of the active members of the appellant Exchange had been active members of the American Cotton Exchange, which had been convicted in the Supreme Court of the State of New York of conducting a bucket shop under sections 390 and 393 of the Penal Law; that the Odd-Lot Exchange was organized for the purpose of permitting its members to conduct bucket shops under the guise of being members of an Exchange; that for this reason the New York Cotton Exchange refused to permit its quotations to be furnished to appellant and for the further reason that there is no commercial necessity or reason for the existence of a cotton exchange such as appellant's, whereon contracts for the future delivery of cotton in less than 100-bale lots are made and that such an exchange is conducive to improper speculation by persons of small means and inadequate knowledge.

The New York Cotton Exchange also asserted in its answer that it had the legal right to safeguard its quotations and to refuse to give them to any

person who, in its opinion, would not safeguard them or would misuse them or give them to others who would use them for the. purpose of promoting bucket shops or improper speculation and that, upon the question whether any applicant for the quotations desired them for an improper purpose, the judgment of the New York Cotton Exchange was final and not subject to judicial review.

All of the defendants set up as a defense and counterclaim in their answers that, although the complainant had been refused permission to use the continuous quotations of the New York Cotton Exchange, it was either purloining the quotations of the defendants or receiving them from some person who is purloining them, and is giving the same to its members, who in turn are distributing them over telegraph wires to many offices in the Southern States, wherein bucket shops are conducted, and wherein said quotations are displayed on blackboards for the purpose of promoting the conduct of said bucket shops, and that the unauthorized receipt and use of said quotations by said complainant and its members is calculated to and in time will, if not entirely stopped, seriously impair the value of the defendants' quotations and ultimately entirely defeat the efforts of the defendants to prevent the use of such quotations in bucket shops as a basis of illegal bets, and will also materially impair the right of the defendants to derive a revenue from the distribution of the quotations.

The defendants prayed that an injunction might issue restraining the Odd-Lot Cotton Exchange, its officers, agents employees, and servants, from receiving, using, selling or distributing, directly or indirectly, the quotations of the New York Cotton Exchange, or any of them, and from having, maintaining, or permitting any telegraph or other wire running into or through its office or exchange, over which said quotations, or any of them, are passing, and from aiding, abetting, or assisting, directly or indirectly, any member of the Odd-Lot Cotton Exchange, or any other person, firm, or corporation, in the city of New York, in selling or distributing said quotations or any of them, until it, he, or they shall have first lawfully acquired the right to receive said quotations, either by contract from the New York Cotton Exchange or, with its consent and approval, from one of the telegraph companies authorized by said New York Cotton Exchange to distribute such quotations.

After answer the complainant moved the court for a preliminary injunction restraining the defendants from refusing to furnish to it and its members the continuous cotton quotations of the New York Cotton Exchange. The defendants also moved for a preliminary injunction enjoining the complainant.

The motions for the injunctions were heard on the bill, answers, and affidavits.

The District Court denied the complainant's motion for an injunction, and granted the motion of the defendants upon the defendants filing a bond in the sum of $30,000 conditioned upon the payment of such costs and damages to the complainant as might be suffered by it if it be found to have been wrongfully enjoined. From the order, entered on March 26, 1923, denying the complainant's motion for an injunction and granting the motion of the defendants for an injunction against the complainant, the latter appealed to this court.

John M. Coleman, of New York City (Oscar B. Bergstrom, of New York City, of counsel), for appellant.

Cadwalader, Wickersham & Taft, of New York City (Henry W. Taft, of New York City, Henry S. Robbins, of Chicago, Ill., and George Coggill, of New York City, of counsel), for appellee New York Cotton Exchange.

Francis R. Stark, of New York City, for appellees Western Union Telegraph Company and Gold & Stock Telegraph Co.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). It appears that the New York Cotton Exchange provides an exchange room in the city of New York where its members meet and make contracts for themselves or as brokers for customers, for the purchase and sale of cotton for future deliveries. Their transactions aggregate many million bales of cotton annually. The contracts are made on the Exchange between 10 a. m. and 3 p. m. by open viva voce' bidding. It claims that the knowledge of the prices upon which these contracts are based constitute a peculiar kind of property and that their value depends on the right to confine the distribution of the quotations to such telegraph companies as will contract with the Exchange therefor and to such customers as will agree with the telegraph companies and the Exchange not to furnish them to others. The Western Union Telegraph Company pays to the Exchange annually a considerable sum of money for the privilege of receiving these quotations and distributing them to those customers of whom the Exchange approves. If any person can promptly acquire these quotations, surreptitiously, and without paying therefor and can give them out to others, the telegraph companies would be put at a disadvantage in competing with such persons and would no longer be willing to pay to New York Cotton Exchange the annual sum now paid to it for the privilege of receiving these quotations.

[1, 2] The complainant does not challenge the claim of the Cotton Exchange that it has a property right in the quotations. Indeed, its right to come into equity for the relief which it seeks assumes that the quotations constitute a species of property. It is that upon which the jurisdiction of equity depends, as courts of equity are concerned only in the protection of property rights. And the right to acquire property is as much entitled to protection as the right to protect property already acquired. International News Service v. Associated Press, 248 U. S. 215, 236, 39 Sup. Ct. 68, 63 L. Ed. 211, 2 A. L. R. 293. And in Board of Trade v. Christie Grain & Stock Co., 198 U. S. 236, 250, 25 Sup. Ct. 637, 49 L. Ed. 1031, the Supreme Court held that quotations of prices or dealings upon a board of trade communicated on confidential terms to numerous persons under a contract not to make them public were entitled to the protection of the law. And see Hunt v. New York Cotton Exchange, 205 U. S. 322, 27 Sup. Ct. 529, 51 L. Ed. 821.

But all the parties to this suit are citizens of the state of New York, so that the jurisdiction of the court in this case does not rest upon diversity of citizenship. If jurisdiction of the bill exists, it must be because the acts complained of therein violate the federal anti-trust laws.

[3] It is plain that the bill cannot be maintained under the Federal Trade Commission Act of 1914 (38 Stat. 717 [Comp. St. §§ 8836a–8836k]). That act declares that unfair methods of competition in commerce are unlawful and the Commission is empowered to prevent persons, partnerships, or corporations, with certain exceptions, from using such methods of competition. But as the only relief that act provides is before the Federal Trade Commission it affords no support whatever for the bill now before us.

[4] The Sherman Act to protect trade and commerce against unlawful restraints and monopolies, being the Act of July 2, 1890 (Comp. St. § 8820 et seq.), invested the District Courts with jurisdiction to protect trade and commerce against unlawful restraints and monopolies. That act made it the duty of the several district attorneys in their respective districts, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain violations of the act. It did not authorize a suit by an individual or corporation for injunctive relief in a federal court. It affords no support, therefore, for this suit.

But the Act of October 15, 1914, known as the Clayton Act, in section 16 (Comp. St. § 8835o), provided that any person, firm, corporation, or association, shall be entitled to sue for and have injunctive relief in any court of the United States having jurisdiction over the parties against threatened loss or damage by a violation of the antitrust laws when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity under the rules governing such proceedings, 38 St. part 1, Ch. 323, page 737. And it has been held in General Investment Company v. Lake Shore & Michigan Southern Railway Co., 260 U. S. 261, 287, 43 Sup. Ct. 106, 67 L. Ed. 244, that the right to sue thus given is to be exercised only in "a court of the United States." It cannot be asserted in a state court.

The Sherman Anti-Trust Act provides as follows:

"Section 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal. * * *

Sec. 2. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states, * * * shall be deemed guilty of a misdemeanor. * * *" 26 Stat. 209.

[5] So that the question which we have to determine is whether the contract which the New York Cotton Exchange has made with the Western Union Telegraph Company, respecting the quotations on the Exchange, is a contract in restraint of trade or commerce, or whether there is shown on the part of the defendants or any of them a monopoly or an attempt to monopolize any part of interstate commerce.

The Supreme Court in Standard Oil Co. v. United States, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734, and in United States v. American Tobacco Co., 221 U. S. 106, 31 Sup. Ct. 632, 55 L. Ed. 663, construed the Anti-Trust Act as prohibiting only contracts or acts which were unreasonably restrictive of competitive conditions, and in the case last cited the court quoted approvingly from the opinion in the Joint Traffic Case, 171 U. S. 568, 19 Sup. Ct. 25, 43 L. Ed. 259, the statement that—

"The act of Congress must have a reasonable construction, or else there would scarcely be an agreement or contract among business men that could not be said to have, indirectly or remotely, some bearing upon interstate commerce, and possibly to restrain it."

As construed by the Supreme Court in the cases cited and in those about to be cited, the Sherman Act is not construed as forbidding or restraining the power to make normal and usual contracts to further trade by resorting to all normal methods, whether by agreement or otherwise, to accomplish such purpose.   And see United States v. Union Pacific R. R. Co., 226 U. S. 61, 33 Sup. Ct. 53, 57 L. Ed. 124; United States v. Reading Co., 226 U. S. 324, 33 Sup. Ct. 90, 57 L. Ed. 243; Nash v. United States, 229 U. S. 373, 33 Sup. Ct. 780, 57 L. Ed. 1232; Eastern States Lumber Association v. United States, 234 U. S. 600, 34 Sup. Ct. 951, 58 L. Ed. 1490, L. R. A. 1915A, 788.

[6] The cases disclose that where the facts clearly show that the purpose of a contract is not to regulate, obstruct, or restrain interstate commerce, but that the object is properly and fairly to regulate the transaction of the business in which the parties to it are engaged, the agreement will be upheld as not within the statute.   The contract is good if "it can be seen that the character and terms of the agreement are well calculated to attain the purpose for which it was formed, and where the effect of its formation and enforcement upon interstate trade or commerce is in any event but indirect and incidental, and not its purpose or object." Anderson v. United States, 171 U. S. 604, 19 Sup. Ct. 50, 43 L. Ed. 300.

And the record in this case discloses that the intention and purpose of the parties in making the contract which the complainant attacks in this suit was a proper and legitimate one.   Prior to 1903 the tele-graph companies were at liberty to gather quotations in the exchange room and to sell them to any one desiring them.   The only motive of the Telegraph Companies was profit, and the more customers the greater the profit.   But it is said this resulted in the creation of many bucket shops throughout the country, where the quotations were post-ed on a blackboard and the keeper of the bucket shop accepted all offers of persons resorting to his place to bet on the fluctuations of prices as indicated by such quotations; these alleged trades or bets being opened at the last price on the blackboard and being closed when the blackboard price reached a point where the customer's margins became exhausted, or where prior thereto the customer desired to close his trade at the last-named price thus essential to the conduct of such business.   The use by these institutions throughout the coun-try of these quotations necessarily brought the New York Cotton Exchange and other regular exchanges into discredit with the pub-lic; it being supposed, from the presence of these quotations, that these bucket shops were in some way connected with these exchanges. To correct this condition and suppress these gambling places, so far as they were operating on its quotations, the New York Cotton Ex-change made a contract in 1903, requiring the telegraph companies—in order to acquire the quotations—to enter into a contract with the Exchange substantially in the form of the contract herein involved. The purpose was, so it is said, to confine the distribution of the quo-tations to those desiring them for lawful purposes, and to thereby exclude their being given to persons who would not carefully safe-guard them and confine them to their own offices.   To the success

of this purpose, it was essential that the quotations should be kept, not only from the bucket shops themselves, but from all persons who should acquire them for the purpose of surreptitiously retransmitting them to bucket shops. To this end, the contract provided for a written application to be signed by each person desiring the quotations, in which he should agree with the Exchange and the telegraph companies, not only that the applicant would not himself use the quotations in conducting a bucket shop, but that he would confine the quotations to his own office and not permit them to be communicated therefrom.

This plan to prevent the misuse of quotations necessarily imposed, either upon the Exchange or the distributing telegraph company, the burden of determining the character and purpose of each applicant for the quotations. The telegraph company had no pecuniary interest in restricting the number of its customers for quotations. The only person having a real interest in preventing the misuse of the quotations was the Exchange itself, and the contract conferred upon the Exchange the right and duty to pass upon the character and purpose of each applicant and make its decision final by providing that the telegraph company should not furnish the quotations to anyone whose application was disapproved by the Exchange. .

It cannot be said that the contract involved was entered into for the purpose of restraining trade or of creating a monopoly. It appears to us that its purpose was that of properly regulating the transaction of the New York Cotton Exchange and of preventing the misuse of its quotations. It is not a contract in restraint of trade or commerce within the meaning of section 1 of the Sherman Act as construed by the Supreme Court. Neither is it an attempt to monopolize trade or commerce among the several states within the meaning of section 2 of the Sherman Act.

[7] The New York Cotton Exchange has the property right in the quotations which it collects. As such owner the Exchange is under no legal duty to sell its quotations to any particular person nor to all because it sells to some. These quotations relate solely to the business of the Exchange which is under no obligation to communicate them, and the telegraph company, as its agent, communicates them to those persons to whom the Exchange permits the communication to be made. In this we see no illegality. Whitwell v. Continental Tobacco Co., 125 Fed. 454, 60 C. C. A. 290, 64 L. R. A. 689; Matter of Renville, 46 App. Div. 37, 61 N. Y. Supp. 549. So far as the contract limits the right of the telegraph company to communicate the quotations to such persons as the Exchange approves, we are unable to distinguish this case from that of Board of Trade v. Christie Co., 198 U. S. 236, 25 Sup. Ct. 637, 49 L. Ed. 1031. That case involved a contract made by the Chicago Board of Trade with the telegraph companies for the distribution of its quotations. The Supreme Court held that contracts under which the Board of Trade furnished the telegraph companies with its quotations, on condition that they would only be distributed to persons in contractual relations with, and approved by the Board, and not to what are known as bucket shops, were not void as being in restraint of trade, either at common law or under the Anti-Trust Act.

The court held the Board of Trade was entitled to an injunction enjoining the defendants from using and distributing the continuous quotations of prices on sales of grain and provisions for future delivery, and which the defendant could not obtain except through a known breach of the confidential terms on which the plaintiff communicated them.

[8] The complainant asks a mandatory injunction compelling the defendants to furnish to it the continuous quotations of prices of contracts for the future delivery of cotton made on the New York Cotton Exchange. The transactions in which the latter Exchange is engaged and in which the complainant itself is engaged constitute, it is claimed, interstate commerce. The bill alleges that the purchases and sales made on the Exchange "constitute a large and important part of the interstate commerce as between said cotton growing states and other states, including the state of New York. That in addition to the said interstate sales and purchase as alleged for delivery from said states, through and into many states of the United States, and into the state of New York, the said interstate commerce involves the interstate shipments and transportation of said commodity, through and from said cotton growing states, to the state of New York whence it is consigned and shipped to other cotton markets of the United States and foreign countries for manufacture." The contracts made on the New York Cotton Exchange are made in the board room of the Exchange in the city of New York, and they provide that the cotton is deliverable from licensed warehouses in the Port of New York. Performance of the contract is made by the delivery of negotiable warehouse receipts issued by licensed warehouses in New York. There is no obligation to make delivery at any place except in the Port of New York. Such a transaction is local in its character and does not involve interstate commerce. The decisions of the Supreme Court make this clear. In Hopkins v. United States, 171 U. S. 578, 19 Sup. Ct. 40, 43 L. Ed. 290, it was held that the Kansas City Live Stock Exchange was not engaged in interstate commerce under the following circumstances: It received consignments of cattle from owners in other states upon an understanding that they should be sold and the net amount realized on the sale returned to the owners. In its opinion the court said:

" * * * It is immaterial over how many states the defendants may themselves or by their agents travel in order to thereby secure the business. They do not purchase the cattle themselves; they do not transport them. They receive them at Kansas City, and the complaint made is in regard to the agreements for charges for the services at that point in selling the cattle for the owner. Thus everything at last centers at the market at Kansas City, and the charges are for services there, and there only, performed.

"The selling of an article at its destination, which has been sent from another state, while it may be regarded as an interstate sale and one which the importer was entitled to make, yet the services of the individual employed at the place where the article is sold are not so connected with the subject sold as to make them a portion of interstate commerce, and a combination in regard to the amount to be charged for such service is not, therefore, a combination in restraint of that trade or commerce. Granting that the cattle themselves, because coming from another state, are articles of interstate commerce, yet it does not therefore follow that before their sale all persons performing services in any way connected with them are themselves engaged

in that commerce, or that their agreements among each other relative to the compensation to be charged for their services are void as agreements made in restraint of interstate trade."

There are other decisions of that court which assert a like doctrine. See Anderson v. United States, 171 U. S. 604, 19 Sup. Ct. 50, 43 L. Ed. 300; Ware & Leland v. Mobile County, 209 U. S. 405, 413, 28 Sup. Ct. 526, 52 L. Ed. 855, 14 Ann. Cas. 1031; Hill v. Wallace, 259 U. S. 44, 42 Sup. Ct. 453, 66 L. Ed. 822.

The complainant relies upon Board of Trade of the City of Chicago v. Olsen, 262 U. S. 1, 43 Sup. Ct. 470, 67 L. Ed. 839. That case involved an appeal from a decree which dismissed a bill in equity brought by the Board of Trade to enjoin certain United States officials from taking steps to enforce the Act of Congress of September 21, 1922, known as the Grain Futures Act, the constitutionality of which act was directly involved. That case is not distinguishable in principle from that of Stafford v. Wallace, 258 U. S. 495, 42 Sup. Ct. 397, 66 L. Ed. 735, 23 A. L. R. 229, which involved the constitutionality of the Packers' and Stockyards' Act of 1921 (Comp. St. Ann. Supp. 1923, §§ 8716¼–8716½z). In neither case has the court overruled the cases heretofore cited in this opinion in which sales on the Exchange were regarded as transactions in intrastate commerce and not in interstate commerce. It sustained the right of Congress to regulate in the one case the boards of trade and in the other the various stockyards of the country as great national public utilities. The acts involved assumed that the corporations regulated by the acts conducted a business affected by a public use of a national character and that they were therefore subject to national regulation. These cases show that the power to regulate interstate commerce is not limited by the fact that intrastate transactions may have become so interwoven therewith that the effective government of the former incidentally controls the latter. We find another illustration of the principle in the Transportation Act of 1920 which authorizes supervision by the Interstate Commerce Commission of intrastate commerce where it is so carried on as to favor persons or localities in intrastate commerce as against those in interstate commerce. See Railroad Commission of Wisconsin v. Chicago, Burlington & Quincy R. R. Co., 257 U. S. 563, 42 Sup. Ct. 232, 66 L. Ed. 371, 22 A. L. R. 1086; The Minnesota Rate Cases, 230 U. S. 352, 399, 33 Sup. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18.

But we find nothing in Stafford v. Wallace, supra, or in Chicago Board of Trade v. Olsen, or in any decision of the Supreme Court, which supports the complainant's contention that the New York Cotton Exchange is engaged in interstate commerce. Neither are we cited to any act of Congress which entitles the complainant to maintain its bill. And we conclude that the bill itself must be dismissed.

[9] Equity Rule 30 (198 Fed. xxvi), permits the defendant in his answer to "state in short and simple form any counterclaim arising out of the transaction which is the subject-matter of the suit, and may without cross-bill set out any set-off or counterclaim against the plaintiff which might be the subject of an independent suit in equity

against him, and such set-off or counterclaim, so set up, shall have the same effect as a cross-suit, so as to enable the court to pronounce a final judgment in the same suit both on the original and cross claims." Under this rule if defendant has an independent cause of action in equity against the plaintiff he may counterclaim it. And a counterclaim so pleaded being in effect a "cross-suit" is not affected by a decree dismissing the bill on the merits. Buffalo Specialty Co. v. Vancleef (D. C.) 217 Fed. 91.

The counterclaim sets up a cause of action within the jurisdiction of the District Court as a court of equity and within its jurisdiction as a federal court. On the dismissal of the complainant's bill the counterclaim in this suit is entitled to be treated as an original bill within the rule laid down by this court in Vidal v. South American Securities Co. (C. C. A.) 276 Fed. 855, 875, and the authorities there cited. It has frequently been said to be the general rule that the dismissal of the original bill carries with it a cross-bill. United States v. California, etc., Land Co., 192 U. S. 355, 24 Sup. Ct. 266, 48 L. Ed. 476; Dows v. Chicago, 11 Wall. 108, 20 L. Ed. 65; Cross v. De Valle, 1 Wall. 1, 17 L. Ed. 515; Ulman v. Iaeger's Adm'r (C. C.) 155 Fed. 1011; Markell v. Kasson (C. C.) 31 Fed. 104; Glos v. Peo, 259 Ill. 332, 102 N. E. 763, Ann. Cas. 1914C, 119; Bell v. McLaughlin, 183 Ala. 548, 62 South. 798. But it is generally recognized that the dismissal of the original bill does not necessarily carry with it a cross-bill. Whether it has that effect depends upon whether the cross-bill is defensive merely or sets up new facts and prays for affirmative relief against the plaintiffs in the original bill and shows grounds for equitable relief which may uphold the jurisdiction of the court independent of the original bill. 21 C. J. 514.

[10] Where, as here, the bill and the counterclaim relate to the same subject-matter, it is quite immaterial that in the case of a cross-bill, and the same principle applies to a counterclaim, the parties thereto are citizens of the same state, and no diversity of citizenship exists. The cross-bill and the original suit are but one cause, and jurisdiction of the latter includes the former. If the court has jurisdiction of the original bill, it has jurisdiction of the cross-bill without reference to the citizenship of the parties, and the cross-bill need not disclose grounds of federal jurisdiction. Shields v. Barrow, 17 How. 130, 15 L. Ed. 158; Freeman v. Howe, 24 How. 460, 16 L. Ed. 749; Cross v. De Valle, 1 Wall. 14, 17 L. Ed. 515; Milwaukee & M. R. Co. v. Chamberlain, 6 Wall. 748, 18 L. Ed. 859; Krippendorf v. Hyde, 110 U. S. 276, 4 Sup. Ct. 27, 28 L. Ed. 145; Phelps v. Oaks, 117 U. S. 236, 6 Sup. Ct. 714, 29 L. Ed. 888; Hogg v. Hoag (C. C.) 107 Fed. 807, affirmed 154 Fed. 1003, 83 C. C. A. 677; Portland Wood Pipe Co. v. Slick Bros. Const. Co. (D. C.) 222 Fed. 528; Cleveland Engineering Co. v. Galion Dynamic Motor Truck Co. (D. C.) 243 Fed. 405. Jurisdiction having attached on the allegations contained in the bill, the court may, upon the hearing, dismiss the bill and grant relief under the counterclaim, although the counterclaim could not have been sustained as an original bill for lack of jurisdiction.

[11] While the court was without jurisdiction to grant the relief which the complainant sought because the facts stated in its bill did

not constitute a restraint of interstate commerce as alleged, it necessarily had jurisdiction to determine the question at issue between the parties. As it acquired jurisdiction for that purpose, it acquired jurisdiction of the counterclaim as its subject-matter was related to and connected with the matters in the original bill; those matters being the future quotations on the Exchange and the contract restricting their distribution. A court of "equity does justice completely and not by halves," and a cause once properly in a court of equity for any purpose will be retained to grant relief which otherwise might not be within the range of its authority—as this court decided in Pierce v. New York Dock Co. (C. C. A.) 265. Fed. 148, 158. And see McGowan v. Parish, 237 U. S. 285, 296, 35 Sup. Ct. 543, 59 L. Ed. 955.

The counterclaim does not bring in any new subject-matter. It relates to the same contract upon which the amended bill is based and to the quotations of the New York Cotton Exchange which the complainant seeks to obtain by having the contract declared illegal. The counterclaim does not introduce new and distinct matters into the litigation. The subject-matter is the same in both.

[12, 13] We are thus brought to a consideration of the counterclaim on the merits. The defendant charged on information and belief the fact to be that the plaintiff either itself purloined the quotations of the defendant Exchange, or that it received them from some person who is purloining them and giving them to its members. When the equity of a bill rests upon the existence of a particular fact, it is necessary that that fact should be clearly alleged. And the allegations of a bill seeking an injunction must be specific. Allegations made upon information and belief are, as a rule, insufficient. In any case where the matters do not lie within the personal knowledge of the plaintiff, he may allege those matters upon information and belief; but the statements of the bill as to such matters should be corroborated as far as possible by the affidavits of persons having personal knowledge. Street's Equity Practice, vol. 3, p. 1351, § 2307. United States v. Butler (D. C.) 278 Fed. 678; In re United Wireless Telegraph Co. (D. C.) 201 Fed. 445; Leavenworth v. Pepper (C. C. A.) 32 Fed. 718; Brooks v. O'Hara (C. C.) 8 Fed. 529.

[14] In the instant case, while the allegations of the counterclaim as to the purloining of the quotations, by the complainant, or as to its receiving them from some one who is purloining them, are upon information and belief, they are sufficiently supported by the affidavits which were presented to the court in support of the counterclaim. Moreover, while the complainant in reply denied that it is itself purloining the quotations, it does not deny in any pleading or affidavit that it is receiving them. The right of the New York Cotton Exchange to protect by injunction its right in the quotations which it collects is, under the circumstances disclosed, indisputable. As the court said in the similar case of Board of Trade v. Christie Grain & Stock Co., 198 U. S. 236, 250, 25 Sup. Ct. 637, 639 (49 L. Ed. 1031):

" * * * The plaintiff's collection of quotations is entitled to the protection of the law. It stands like a trade secret. The plaintiff has the right to keep the work which it has done, or paid for doing, to itself. The fact that others might do similar work, if they might, does not authorize them

to steal the plaintiff's. Compare Bleistein v. Donaldson Lithographing Co., 188 U. S. 239, 249, 250. The plaintiff does not lose its rights by communicating the result to persons, even if many, in confidential relations to itself, under a contract not to make it public, and strangers to the trust will be restrained from getting at the knowledge by inducing a breach of trust and using knowledge obtained by such a breach."

See Exchange Telegraph Co. v. Gregory & Co. (1896) 1 Q. B. D. 147; F. W. Dodge Co. v. Construction Information Co., 183 Mass. 62, 66 N. E. 204, 60 L. R. A. 810, 97 Am. St. Rep. 412; Board of Trade v. C. B. Thomson Commission Co. (C. C.) 103 Fed. 902; Board of Trade v. Hadden-Krull Co. (C. C.) 109 Fed. 705; National Tel. News Co. v. Western Union Tel. Co., 119 Fed. 294, 56 C. C. A. 198, 60 L. R. A. 805; Illinois Commission Co. v. Cleveland Tel. Co., 119 Fed. 301, 56 C. C. A. 205; Board of Trade v. McDearmott Commission Co. (C. C.) 143 Fed. 188, 190; McDearmott Commission Co. v. Board of Trade, 146 Fed. 961, 962, 77 C. C. A. 479, 7 L. R. A. (N. S.) 889, 8 Ann. Cas. 759; Board of Trade v. Hadden-Krull Co. (C. C.) 109 Fed. 705; Board of Trade v. Cella Commission Co., 145 Fed. 28, 76 C. C. A. 28; Board of Trade v. Price, 213 Fed. 336, 130 C. C. A. 302.

The order appealed from, which denied the complainant's motion and granted the defendant's for a preliminary injunction, is affirmed. And the court below is directed to dismiss the complainant's amended bill.